Filed 11/25/15  P. v. Hayes CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Plaintiff and Respondent,<br><br>vs.<br><br>GREGORY HAYES,<br><br>        Defendant and Appellant. | A136366<br><br>(San Francisco City & County<br>Super. Ct. No. SCN 217763) |

This appeal presents the question whether at any time after defendant and appellant Gregory Hayes was restored to competency by Napa State Hospital there was substantial evidence of doubt that he was competent to stand trial.  If there was such evidence, the trial court had a sua sponte duty to suspend the proceedings, appoint counsel for defendant and experts to evaluate him, hold a competency hearing and determine whether he was competent to stand trial.

We conclude the trial court had substantial evidence to doubt that Hayes, who had been diagnosed with and treated for serious mental illness, was competent to stand trial.  In failing to hold a competency hearing prior to or during the trial of Hayes on charges of stalking, making criminal threats and repeatedly violating a restraining order, the trial court abused its discretion.  This error is prejudicial per se.  We also conclude that this case does not fall within the rare category of cases in which it is feasible for the trial court on remand to determine retrospectively whether the defendant was competent to stand trial.  For these reasons, we reverse the judgment and remand for further proceedings.

1

We do not reach Hayes's other assertions of error because our opinion here renders them moot. Our opinion here also disposes of—and renders moot—additional errors asserted in this appeal and in Hayes's separate petition for habeas corpus, case number A141842, which we deny in a separate order this day.

## BACKGROUND

We relate the procedural and factual background of this case at length, given the unusual nature of the proceedings and resultant sentence.

### I.

### *The Basis for the Criminal Charges*

In August 2008, Hayes lived around the corner from Meredith Crawford (Crawford). Crawford saw Hayes walking with a cane and wearing a neck brace, so she gave him some flowers "because he was obviously in a hurt position." On about August 15, 2008, Crawford met Hayes again in a neighborhood postal center and they spent the day together. Over the next two weeks, they spent some time together and had sexual relations. Altogether, they saw each other no more than eight times over a two-week period.

Crawford had ended a relationship with her boyfriend about six weeks before meeting Hayes, but was not ready to begin a new relationship, so she told Hayes she was not interested in spending so much time with him. Hayes became angry and accused her of "messing with him emotionally." Crawford then told Hayes she did not want to see him anymore. She found it alarming that he "became accusatory at [her] so quickly."

Hayes responded by sending Crawford text messages and e-mails that "accused [her] of messing with him, calling [her] names." In several e-mails, he said Crawford's friends were outside talking about him, singing his songs and threatening him. He wrote that he would be outside her house and she could send out her friends to beat him up. Crawford testified her friends were not aware of her brief relationship with Hayes, and she considered it impossible that her friends "would be sitting outside in a shared yard talking about it."

2

One day, Hayes sent Crawford about 15 text messages, and she agreed to meet with him. They were on speaking terms again briefly and would go to a coffee shop. However, Hayes then sent "another barrage" of messages asking, "Why did you do this to me?" After October 4, 2008, Crawford stopped responding to Hayes's e-mails. In a final e-mail to him, she asked him to stop contacting her and informed him she would not communicate with him. She made no further attempt to contact him.

Hayes continued to send e-mails to Crawford, so she filed complaints with the police. She considered his behavior "alarming" and "unreasonable," "especially when he was talking about my friends being involved and things that weren't true." The police advised her not to block his e-mail so she could continue to document his contacts. Sometime later in 2008, Hayes stopped e-mailing her.

Hayes resumed e-mailing Crawford in October 2009. Some messages were "cordial and inviting," but others were "derogatory," accusing her of "messing with him emotionally." She filed another police report. The e-mails continued into 2010, and some contained songs. One song, sent repeatedly, was titled "Stalker Song." Its lyrics included: "You'll never be able to get away, I'll always be there, you'll be in my head." The song alarmed Crawford. In January 2010, Crawford was in a cafe and saw Hayes outside, walking back and forth outside staring at her.

On June 2, 2010, Crawford obtained an order restraining Hayes from having any contact with her. Hayes attended the hearing but did not oppose the request. An hour after he was served with the restraining order, however, he sent her an e-mail. His e-mails became even more frequent thereafter. Crawford received about 100 e-mails from Hayes between issuance of the restraining order and the time she later "filed charges."

In some e-mails, Hayes apologized to Crawford "for all the terrible things" he said to her. He told her he had sent her songs because he thought she would like them. In some messages, he talked about getting married to Crawford and having grandchildren. He referred to her as his "girlfriend." He invited her for Thanksgiving dinner with his family. He sent her a song about being with her and said people wanted them to be together so he could write more songs. Hayes also sent Crawford messages asking her to

stop others from reporting him to the police. He wrote: "It's not going to stop until I have someone who is in love with me. That person is you." Crawford continued to file police reports until 13 or 14 were on file.

One of Hayes's e-mails stated: "I send you a picture of my cat. She's so pretty." The email contained a photograph of an erect penis with a cat in the background. Another e-mail said he was tired of writing to Crawford and wanted to hold her.

Hayes's e-mails became more erratic in content. He indicated there was a conspiracy engineered by Crawford's friends to damage him socially and economically. He threatened harm to Crawford if she became involved in the conspiracy. He sent pictures of knives. In one e-mail contained, he wrote: "Fuck you, cunt bitch" and accused her of wanting to "jerk me around and hurt my feelings." In another, he told her: "You are not giving me the sex I need to have power," and "[t]he restraining order will not be enforced." He wrote: "You are killing me by not being with me" and "If we cannot be together, I prefer this to death." In one e-mail, Hayes wrote: "This guy harassed me when I was pretty obviously suicidally depressed and then worked to take my life away. Now I'm about to take his life away. . . . You stand by him, you are in the cross hairs." Hayes invited Crawford to have him arrested and asked why she never bothered to block his messages. Other messages continued to refer to Hayes and Crawford getting married and being together.

Hayes sent Crawford a message telling her: "There are many, many things to be frightened of." In another, he attached a photo of a knife and stated: "Admiring my beautiful blade. Seeking city where they make the samurai swords. We are going there when we tour Japan." In another, he stated: "We're killing your mom. That's the way to get out of pretty much anything jack ass can come up. Okay, fucktard, we're killing your mom. How's that gonna feel? Not so good. Probably pretty bad. But don't worry cause then we're killing you. Now what were you saying?" He repeated threats against Crawford and her mother in a subsequent e-mail. Several of his other e-mails had content Crawford regarded as threatening. She decided to press charges.

On June 18, 2011, the police arrested Hayes. The felony complaint arrest warrant alleged 95 counts: one felony count of stalking in violation of a restraining order (Pen. Code, § 649.9, subd. (b))[1]; four felony counts of making criminal threats (§ 422); and 90 misdemeanor counts of disobeying a domestic relations court order (§ 273.6, subd. (a)).

## II.

### *The Initial Competency Hearing*

On June 24, 2011, the court appointed Deputy Public Defender Randall Martin as Hayes's counsel. Hayes's appointed counsel in a separate misdemeanor case, Evan Budaj, expressed doubt as to Hayes's competency and the court suspended criminal proceedings in that case and this one.

On June 29, 2011, Judge Wong appointed Doctors Lisa Jeko and David Kessler to examine Hayes and report to the court on his competence to stand trial. Kessler's report, dated July 19, 2011, reflects, based on his interview with Hayes, that Hayes first underwent psychiatric treatment in 2008, was seen at a clinic and was twice involuntarily committed at San Francisco General Hospital, and left San Francisco thereafter. Hayes saw a psychiatrist in Georgia who prescribed an antipsychotic, Risperdal, which Hayes stopped taking because it was too "powerful." In 2009 he was back in San Francisco and suicidal. He made a suicide attempt in Florida by cutting himself and was hospitalized for six days and diagnosed with Manic-Depressive Disorder. Thereafter he was again back in San Francisco where he was treated for Major Depression and prescribed Lexapro, which he later discontinued.

Kessler's report stated: "[Hayes's] history and account of his involvement in the current alleged offenses are consistent with the presence of a psychotic paranoid disorder, based on symptoms including persistent persecutory delusions together with prominent accusatory and command auditory hallucinations." Kessler noted that Hayes "has undergone brief psychiatric hospitalizations in the past, with apparent prompt, although probably superficial, recompensation." As to Hayes's competency to stand trial, Kessler

---

[1] All further statutory references herein are to the Penal Code.

wrote: "Mental competency to stand trial is a legal, rather than a psychiatric determination. The defendant clearly understands the nature of the charges against him, and their possible consequences. He is alert, and in good contact, with intact intelligence and concentration. His responses are relevant and coherent, and his behavior is appropriate. He asserts that he has confidence in his current attorney, who reportedly believes his client to be mentally competent for trial. While the defendant's thoughts about the alleged offenses may be founded on irrational premises, they are not manifestly bizarre, in the sense that they are not wholly outside the realm of possibility. In addition, as noted, defense counsel is said to be prepared to represent him on this basis." [2] Kessler's report does not directly state an opinion that Hayes was competent to stand trial but implies that was his opinion.

Jeko's report, dated July 22, 2011, noted that Hayes, who was 39 years old, had a history of psychiatric hospitalization starting at age 14. Hayes initially denied having any mental health incidents in San Francisco or prior suicide attempts, but San Francisco police reports indicated otherwise. Hayes told Jeko he had been hospitalized for "depression" when he was 14, again when he was 17, again in 2008 in Florida after a suicide attempt and again in San Francisco General the same year. Hayes had been arrested for DUI in 1992 and reckless driving in 2000, and had contacts with police for "Suspicious Occurrence" on one occasion and "Mentally Disturbed Aided Case" on two occasions in 2008. His mother had reported to Jail Psychiatric Services (JPS) that defendant had been diagnosed with Bipolar Disorder. Hayes admitted receiving outpatient treatment at a mental health clinic in 2009, where he was prescribed the antipsychotic Risperidone and the antidepressant Lexapro, but stated he had stopped taking these medications in 2010. Jeko reported that JPS had not prescribed any psychotropic medications but that its clinicians had "suspected a paranoid thought

---

[2] Kessler had not spoken with Martin. At the July 27, 2011 hearing when Kessler's report was received, Martin observed: "Dr. Kessler's opinion would seem to be based on his reference that Mr. Hayes told him that I believed him to be competent. I have never informed Dr. Kessler that that was my opinion."

6

process." JPS's primary diagnosis was Personality Disorder, and ruled out diagnoses of Bipolar Disorder, Mood Disorder, Schizoaffective Disorder or Substance-Induced Disorder.

Jeko stated that Hayes "clearly evidenced fixed paranoid delusions." She observed that Hayes's "thought process was intact, save when there were manifestations of his paranoid, delusional ideation. When his fixed delusions were revealed, he became increasingly animated and determined to describe, in great detail, his reasoning." Hayes was not currently taking any psychotropic medication. Jeko believed "antipsychotic medications appear necessary in order to loosen [Hayes's] fixed delusions," and medication would likely help him regain competency. In contrast to Kessler, who disposed of Hayes's ability to rationally assist counsel in a few sentences that assumed the truth of Hayes's representation that Martin believed Hayes was competent, Jeko devoted two pages of observations and evaluation to the topic. Jeko had spoken with Martin, "who expressed concern that Mr. Hayes suffered from paranoia and believed in a 'conspiracy theory' that others had been hacking into his email, and waging his self-defense based upon this theory in the case pertaining to the charges of stalking and repeatedly violating the conditions of the restraining order placed upon him in June 2010." Jeko concluded Hayes could not assist counsel in a rational manner: His "paranoid delusions impinge on his ability to adequately assist counsel in his own defense. . . . He refuses antipsychotic medication, or, for that matter, any psychotropic medication that would serve to loosen paranoid delusions . . . [which] are both relevant and necessary in restoring him to competency, an understanding that he does not share. This combination of factors contribute to his inability to adequately assist his attorney in his own defense."

The discrepancy between Kessler's and Jeko's reports led the court to order a third evaluation. Dr. Brad Novak's 16-page report dated August 5, 2011, describes information contained in records he reviewed. It indicates that Hayes repeatedly denied having mental health or psychiatric issues and had declined medications. Jail medical records indicated that Hayes's mother reported that her son "is a high functioning

7

bipolar" with a "history of manic and depressive symptoms," that he "is in 'crisis' now in a similar fashion that he was in during the 2008 hospitalization timeframe," and that " 'He has some serious delusions. He believes his charges are related to a conspiracy that is targeting him.' " Hayes's mother also said she thought Hayes " 'needs medications.' " His mother reported "periods of clarity but also episodes of agitation and lack of touch with reality." According to Novak, Hayes "seemed motivated to minimize his history of mental illness and therefore it is not known if his stated history is completely accurate." Novak "was left with the impression that he was hospitalized [in 2008] in the context of delusional paranoia involving his belief that he is 'harassed.' " Hayes said he had a history of depression, but what he described was "not . . . a clear history of depression but rather was . . . paranoia." Novak reported that Hayes "does not think he has a history of paranoia but rather that he has been the victim of harassment by multiple people." Hayes "denied a history of other potential psychotic symptoms" though he admitted a history of being prescribed with "risperidone (antipsychotic medication)" and that "his past psychiatrist . . . thought that he was delusional." Hayes reported having stopped the psychiatric medications.

Novak stated: "Although he was very articulate, as the interview went on [Hayes] became more and more focused on what I thought was delusional material. He gave a somewhat confusing account of how he has been 'harassed' by a variety of people including the alleged victim in his case. [¶] . . . He believes that people associated with [a woman he briefly dated] have been harassing him by hacking into his computer and email and tapping his phones. He even thought they were able to 'blow up' his computer via the hacking. [¶] He says people harass him by saying he will never pass the bar exam.[3] He rambled about how he was being harassed because of his herpes virus. He said he was being harassed by his neighbors who say he is spreading 'the herpes around.' [¶] He explained that his harassers are rather sophisticated; as he has been set up to get arrested when in fact he is the victim. He is no longer sure if the alleged victim is

---

[3] Hayes reported that he has a law degree from JFK University.

involved in the harassment. He never gave a rational or articulate explanation regarding why so many people would be conspiring to harass him." Hayes told Novak he wanted to enter a plea of not guilty based on self-defense, but Novak considered this decision to be "based on his delusional beliefs." "He said that under no circumstances would he allow an attorney to present a defense based on [his] mental illness. He explained because he knows that his beliefs regarding his harassment are not delusional, that he 'absolutely' will not allow his attorney to present evidence that he is mentally ill."

Like Jeko, Novak believed treatment with psychotropic medication could help Hayes regain competency.[4] He also stated: "It is highly unlikely that [Hayes] is currently malingering (faking or fabricating his symptoms of psychosis). In fact, he is very much minimizing his current impairment as he insists that he is not delusional. Moreover, his displayed delusional thoughts were very consistent with mental illness. The reviewed mental health records also provide support that he has genuine impairment and is not malingering."

Novak opined that Hayes was not currently competent to stand trial. Specifically, he observed that Hayes's "reasoning of his decision to enter a not guilty plea was primarily based on his delusional beliefs. He was preoccupied with his belief that he has been the victim of an elaborate conspiracy involving many people who have harassed him. He talked about his phones being tapped, his email being hacked and his computer being hacked and then 'blown up.' [¶] Based on his above beliefs regarding 'harassment' and based on his belief that the evidence against him is 'circumstantial,' Mr. Hayes expressed the belief that the case against him is not strong. He said the charges against him are 'outrageous.' " Novak opined that despite Hayes's "ability to understand his legal process, he does not have the ability to assist counsel in a rational manner. This is a direct result of his ongoing delusional thoughts regarding him being a victim of a conspiracy of harassment. . . . [¶] These beliefs render him unable to rationally assist his

---

[4] Kessler's opinion was that "treatment with anti-psychotic medications may not readily result in appreciable change."

attorney because he insists that his attorney not be allowed to present evidence that these beliefs are evidence of mental illness. . . . [¶] Instead, he wants his attorney to enter a plea of not guilty on his behalf and take the case to trial where Mr. Hayes hopes to prove his innocence in part by showing that he has been the victim of harassment. In essence then, he wants his attorney to present an irrational defense that Mr. Hayes' delusional beliefs are not in fact delusional but rather actual evidence of his innocence. . . . [¶] . . . [¶] Although Mr. Hayes did not endorse delusional thoughts towards his current attorney, there is evidence that he has had delusional paranoia directed towards other members of the legal process. His letter to the district attorney's office dated 7/21/11 displays evidence of paranoia toward the district attorney's office. Therefore he is at risk of incorporating members of the legal process involved in his case into his delusional thinking regarding his harassment."

At a hearing before Judge Wong on September 14, 2011, Martin read into the record a rambling letter Hayes had written to San Francisco District Attorney George Gascón. The letter stated Hayes was incarcerated for criminal threats and stalking, would be "going to trial soon and expect[ed] to be found not guilty." Hayes advised Gascón that once he was found not guilty, he "expect[ed] the D.A. to bring charges against the people who have harassed me for the last three years or so. This is an organized group of people, some of whom may be attorneys and investigators and who also may have contacts with the district attorney's office and the police. Their actions have been extremely abusive and destructive to my life, and I believe I am not their first or only victim. In short, these people are a serious threat to our community." The letter further advised that Hayes had "already contacted Supervisor Mirkarimi in regards to this matter and will contact all of the other supervisors, the Mayor's office, and possibly the F.B.I. or other federal offices."

In the letter, Hayes demanded that "the D.A. take action that file charges against this gang, for lack of a better word," stating this matter would be "highly publicized." He claimed there were "apparently licensed attorneys, investigators who are behaving completely unethically," "they [were] apparently involved with trafficking cocaine,

10

particularly to local restaurants," and "they use[d] hacking technique to monitor and harass victims." Hayes claimed his phone, e-mail and home computer "were all compromised. Work and social e-mails regularly disappeared. Some of the evidence against me consists of e-mails I did not compose or send or which have been modified." There had been an "abuse of process" involving "setting people up, framing them, setting them up to be charged by the police, et cetera. In my case, they seem to have encouraged someone to put a restraining order on me and continue to harass me, leaving contacting the protected party as the only way I had to find out what was going on, since she is the only person whose identity I actually know. I was arrested when I started to threaten them for harassing me, not her." The letter described "third-party sabotage as in instigating conflicts with others so as to overwhelm the victim's life and resources. In my case, multiple simple, easily-resolved disputes were blown completely out of proportion, I believe due to the third-party activity, really outrageous, irrational behavior, all seemingly caused by the third party's influence, intensified civil disputes, angry confrontations, et cetera." Hayes believed he was being subjected to "serious ongoing harassment" that was "designed to be difficult to trace and detect." The letter again demanded "that the D.A. take action against these people."

Counsel submitted the matter on the reports of Drs. Kessler, Jeko and Novak. The court was "persuaded by Dr. Novak's and Dr. Jeko's evaluations. They are internally and largely consistent and they both concur with the fact that defendant is unable to assist counsel in the conduct of the defense in a rational manner as a result of a mental disorder." The court also found Hayes lacked the capacity to make a decision regarding antipsychotic medication.

Hayes addressed the court, strongly objecting to the competency proceeding, particularly when there had been "absolutely no investigation as to my claim that was outlined in this letter." Judge Wong told Hayes he appreciated his remarks but believed they were "consistent with what has been said by Dr. Novak. It is clear that you understand the nature of the charges, the court proceedings, and legal terms. But it's also clear that you do not have the ability to assist counsel in a rational manner at this time.

11

And it appears to be the direct result of ongoing thoughts regarding your feeling that you are a victim of a conspiracy of harassment."

On October 5, 2011, the court committed Hayes to Napa State Hospital for treatment to restore his competency and authorized the hospital to involuntarily administer antipsychotic medication.

## III.

### *The Certification That Hayes Had Regained Competence to Stand Trial*

Hayes was admitted to Napa State Hospital on November 30, 2011.  On February 7, 2012, the medical director of Napa State Hospital certified that Hayes was presently competent to stand trial.  The accompanying report (hereafter "restoration report") diagnosed Hayes as suffering from Bipolar I Disorder, with the most recent episode being "Manic Severe with Psychotic Features."  According to the report:  "At the time of this letter, Mr. Hayes no longer shows signs and symptoms of an active Manic Episode.  His speech is within normal limits, he is much less irritable (although irritability is notable in discussions regarding his perceived treatment during the legal proceedings and issues of medication) and his thought processes [are] within normal range.  His thoughts do not appear to race and he presents them in a more controlled manner."

The report also considered a diagnosis of "Delusional Disorder, Persecutory Subtype" and reported:  "Mr. Hayes continues to report a belief system that has been considered delusional by previous evaluators.  He states that a group of individuals associated with a woman he dated for a brief period in 2008 have colluded to make his life as difficult as possible by harassing him and sabotaging him in various areas of his life.  He said that he believes the individuals began bothering him after he and this woman stopped dating.  He said they began bothering him because they are immature and enjoyed bullying people.  As he responded to them by yelling at them, disparaging them, and attempting to out maneuver them, the harassment intensified.  Mr. Hayes reports that these individuals hacked into his computer and tampered with emails and important documents he had created.  He reported that at times he could hear them yelling at him

12

and mocking him from the neighboring home where they lived and he could tell [by] looking at people whether or not they were involved or had been privy to his emails. Mr. Hayes provided examples of how he believes they interfered with his life ranging from talking to people with whom he had become friends to discourage them from maintaining the relationship to changing his internet passwords and spreading rumors about him throughout the neighborhood. He states that the individuals involved are well-educated and, over time, constructed and executed a plan to place him in a situation where his claims against them appear to be delusions."

Hayes had been prescribed risperidone "for psychosis and mood stability" but was only partially compliant with his medication. The report stated: "Mr. Hayes has been resistant to medication from the outset of his admission to [the hospital]. Upon admission he agreed to take 1 mg. of [risperidone] after 2 mg. was initially recommended." The hospital recommended Hayes continue his medication after discharge "for continuity of care."

However, the report could not conclude that Hayes was delusional: "Without collateral information regarding what actually occurred during the period when Mr. Hayes felt harassed, it becomes difficult to conclude that Mr. Hayes'[s] beliefs are in fact delusions." The report concluded that "even if his beliefs are delusional, . . . Mr. Hayes has the capacity to assist in his defense in a rational manner" for four reasons: (1) He had demonstrated that he can think flexibly about how others may perceive "his proposed legal strategies," understood "that his reports of being harassed may be difficult for others to believe and difficult for him to prove," and indicated he would abandon a defense that relied on his being harassed if he could not obtain evidence sufficient to support his argument. (2) Hayes had reported that he wanted to represent himself with the assistance of advisory counsel. "The reasons for this decision to represent himself appear reasonable and rational. He said that he wants to have more control over his case and was dissatisfied with what he perceived to be inadequate representation prior to his finding of incompetency." (3) Hayes had declined an opportunity to expedite his competency evaluation and demonstrated to his treatment team a capacity to work with

13

others in a rational manner. (4) Hayes had "demonstrated that he has the ability to advocate for his rights in multiple aspects of his treatment during this hospitalization."

After Hayes returned from Napa, Martin declared a conflict to the court, which relieved him as Hayes's counsel. The court then appointed Peter Furst as conflict counsel for Hayes. At a hearing before Judge Wong on March 14, 2012, Furst told the court: "There is a report that came back . . . which says that Mr. Hayes is competent. So I'm not going to challenge that report, your Honor. I would have liked to have seen what the original evaluators would say after the fact. But I don't think that's going to happen. And so I'm not going to challenge that report." Furst and the People submitted the issue of restored competency on the state hospital report, the court found Hayes competent, and criminal proceedings were reinstated.

## IV.

### *Hayes's Motion to Represent Himself*

On March 15, 2012, Hayes sought the court's permission to represent himself. Judge Chan questioned whether Hayes could "carry out the basic tasks to conduct your defense" and asked him to describe his educational background. The court asked Hayes whether he was aware of the risks of self representation, understood he might do himself more harm than good and would receive no special treatment, understood he would face an experienced prosecutor, and understood the elements of the crimes with which he was charged. None of the court's questions addressed whether he intended to mount a defense based on his delusions. After Hayes answered the court's questions affirmatively, the court granted Hayes's motion for self-representation.

The court asked whether Hayes wanted advisory counsel, and Hayes responded that he did. Although Hayes indicated that he would work with Furst as advisory counsel, when the court asked Furst to assume that role Furst stated he would do so if ordered but was disinclined to do so. Hayes stated he was prepared to proceed without waiving time and without advisory counsel. The preliminary hearing was set for March 26, 2012. The court did not appoint advisory counsel but granted Hayes's request for a private investigator. On March 20, 2012, Judge Chan relieved Furst of his duties

14

and appointed John Murphy as Hayes's investigator. The court did not appoint advisory counsel until the middle of trial, after the People rested their case.

## V.

### *The Preliminary Hearing*

At the preliminary hearing before Judge McCabe on March 26, 2012, Hayes represented himself. The prosecution's case consisted of the testimony of John Keane, the lead investigator in the case, and numerous exhibits, including e-mails Hayes sent to Crawford. In cross-examining Keane, Hayes repeatedly asked about the connection of persons named Steve and Jason to Crawford and to the case. Keane knew of a person named Steve only as someone Crawford said Hayes had ranted about and who might be in law school with Hayes.

Hayes testified on his own behalf. We quote this testimony at length as evidence of the beliefs underlying his self-representation at the preliminary hearing and later at trial:

"In October 2008, after briefly dating, [Crawford] and I broke up. . . . Shortly after, I ended up with friends of hers very seriously harassing me for over one week. This harassment was so severe that I left the city, dropped out of law school, lost my housing, and attempted suicide. It was all coordinated by someone named Steve. I returned to San Francisco and I resumed my studies in early 2009. I was extremely depressed and isolated and didn't do much except school and an internship.

"In late 2009, I contacted [Crawford] again because weird things were constantly happening and I had the ongoing sense of slander, which I assume originated with this Steve person. So I wrote to her and asked her to tell me who was involved in the events of 2008. She didn't write back, but immediately I started to be very seriously harassed again. People would say odd things to me in my neighborhood. People I was just getting to know would suddenly stop talking to me, and this harassment became so intense I dropped out of school again. . . .

"So I started writing songs to [Crawford] because she didn't seem like the sort of person who would constantly slander someone for something that had happened a full

year before. I wrote some really good songs and in early 2010 [t]hings were looking good. I started volunteering at local community gardens and playing out at open mikes in town and feeling better. Then, very suddenly and without warning, in June of 2010, [Crawford] put a restraining order on me, which I did not oppose.

"So I told her I was trying to apologize and stopped contacting her completely. But the harassment intensified and it was constant. Constant slander and sabotage. Things just going suddenly wrong. People I didn't know trying to start fights with me, acting totally unreasonable towards me in local cafes and bars and Hayes Valley Farm. All the time. So I just kept on going and tried to ignore this.

"I got back into school for my last semester before graduation, but it was really intense. People were constantly starting conflicts with me and demeaning me. A business deal I worked on for months went suddenly wrong. Then, in late 2010, I got tired of it all and I started to make fun of [Crawford] and write her more songs and tell her I love her and call her my girlfriend and tell her stories about our international super band.

"Then the same thing went on—wait. I sent her lots of stories, songs, and pictures. Basically, a unified work that I later placed under copyright called "Letters to Girlfriend." Then the same thing went on. I was constantly being abused by people in ways that seemed inspired by very pervasive slander. I just kept moving.

"Then I graduated from law school. I started making plans to take the July 2011 bar exam. Then, in late February of 2011, [Crawford] walks up to me in the street, Hayes Valley, near my apartment. She says she wants to talk to me, so we go near the mini park near [Page] and Laguna, and she told me that she is in a relationship with Steve, and that he is an attorney who deals coke and works with the cops and beats her up, and that he is the one harassing me, along with his friend Jason, and that they have hacked into my computer, e-mail, and phone, and are constantly slandering me. She says it's like a game to them.

"I just don't know what to think. So I asked her to come stay with me and get out of the situation, but she won't even tell me either of their last names. I end up getting

16

kind of annoyed, because it's really negatively affecting my life, but then she just leaves, and then the harassment starts to get really, really intense. E-mails are being erased, songs are being erased, legal work product is disappearing from my laptop. Then I start to realize that my computer processing chip was blown out just a couple weeks before, and those are the exhibits of the MAC store bills."[5]

"Then it all becomes extremely overt. I meet a woman, get her number, go home, and then the number is gone. Constantly. I'm actually looking for a real girlfriend, so this is very disruptive and damaging to my life. Then the business deal that went wrong turns into a lawsuit, and that's still an ongoing lawsuit. . . .

"Songs were disappearing, legal work product is disappearing, my computer is turning on and off, the password is being changed back and forth. My access to bar-based study site is being changed back and forth. All kinds of stuff. It was just total communications chaos. And this was going on—along with this, like, I was constantly getting into, like, you know, just disputes with other people that seemed to be instigated by a third party who was not physically involved. . . .

"So I'm writing legal theories to [Crawford] about how I'm going to sue Steve, and we, her and I, are going to sue him because I'm trying to instigate him or him and her to do something to reveal themselves or just get me arrested so I can have some justice."

"Then in April of 2011, people from Hayes Valley Farm suddenly demand that I leave the farm for no reason. This starts a dispute that leads to misdemeanor battery charges against me, and they file three restraining orders against me in one week while I'm attempting to study for the bar exam. They refuse to attend scheduled mediation. And like other disputes that I was involved in, it was just completely unreasonable, completely instigated by a third party."

"So then coming into May, I just start talking trash to Steve constantly in [Crawford's] e-mail, Steve being, you know, this person who I don't know who he is or what's going on. I know I was told that name by her."

---

[5] Hayes introduced receipts for computer repair into evidence.

17

"And then things start happening after my arrest that I believe are related. I believe that my misdemeanor battery attorney, Evan Budaj . . ., knows Steve and Jason and/or [Crawford], and that he intentionally suspended my proceedings with absolutely no factual or legal investigation eight working days after my arrest, while not—or no longer my attorney of record. He intentionally suspended my proceedings and referred me as incompetent under these facts with no investigation . . . ."

"Then he directly diagnosed me . . . as suffering from a fixed hallucination, incapable of understanding the nature of this offense, even though he's not a licensed psychiatrist or psychologist. [¶] . . . [¶] In doing so, caused my unnecessary illegal commitment to Napa State Hospital. Because when I told the competency evaluators to review my—only prosecution evidence, none of the defense evidence, my side of the story, they assumed that what I told him was a delusion. That's why I've been incarcerated for nine months with no actual representation, denied representation, denied any and all due process.

"This is the background for the situation of my charges. I thank this [c]ourt for hearing me and respecting my right to self-representation, as this has been a very frightening and troubling experience. I have been in jail for nine months with absolutely no due process. I've been denied my right to self-representation, which is absolutely ridiculous."

After presentation of evidence, the court found probable cause to hold Hayes on the charged offenses. The court did not raise the question of Hayes's competency to stand trial.

On April 6, 2012, the People filed an information charging Hayes with the same 95 counts alleged in the initial complaint. Hayes was arraigned on April 9, 2012. Hayes did not waive time for trial.

## VI.

### *The Period Between the Preliminary Hearing and Trial*

On April 11, 2012, at a hearing before Judge Lam on Hayes's motion to be released on his own recognizance, Hayes repeated the core components of his conspiracy

theory, including his contention that his attorney in the battery case, Evan Budaj, had played an active role in "the conspiracy against me which has caused the felony charges to falsely be brought, unnecessary competency proceedings to be maintained against me, and justice to be severely perverted." Hayes said he didn't oppose the restraining order Crawford sought "because if she didn't want to talk to me, I wasn't going to talk to her. But at about six months after that harassment, really intensive harassment on the part of her and her associates which would lead me to believe that the restraining order is essentially part of a set up. There is, like, over, you know, 13 something police reports that she's filed against me, none of which are really saying anything besides that I'm contacting her via e-mail which I was doing to try to determine who is harassing me and why. In the end of this when I was arrested, my computer was blowing up, passwords are changing on my computer. I was trying to study for the state bar exam. Crawford and/or her associates had been harassing me for over three years extremely, severely. And this—Evan [Budaj] is very likely one of their associates because of the extremely suspect nature in which he referred me. And if you look at what happens, Evan [Budaj] said I was delusional. What's the delusion? The delusion is that I am being harassed. So that sets me up in a situation where anything I say to a competency evaluator is considered to be an aspect of delusion if I say people are hacking into my computer, people are harassing me, et cetera, et cetera, et cetera. This is an absolute perversion of justice. It is a part of a conspiracy to unlawfully arrest me and maintain false proceedings against me." The court repeatedly asked Hayes to focus on his request to be released on his own recognizance.

Hayes stated: "And then I would like to directly ask ADA Nathan Quigley on the record if he knows or associates with any of the persons I've mentioned today, [Crawford] and Jason Crawford, Steve Capalini, or Evan [Budaj]."[6]

---

[6] It is unclear how, after the preliminary hearing, Hayes came to believe that Jason's last name was Crawford and Steve's last name was Capalini (or, as it is subsequently spelled in the record, Cappellini). During the entire course of the proceedings, it was never demonstrated that there are people with these names.

The court refused to permit the question and denied the motion. But despite the obviously delusional nature of Hayes's statements to the court, including his statements that his attorney and the competency proceedings were part and parcel of a broader conspiracy against him and his apparent suspicion that the assistant district attorney was also a participant in that conspiracy, the court did not raise the question of Hayes's competence to stand trial.

On May 23, 2012, Hayes wrote to Judge Lam complaining about a missing *Brady* motion which had been filed a month earlier. He accused his appointed investigator, Murphy, of lying to him and unlawfully giving him legal advice that turned out to be incorrect. He further accused Murphy of "acting in conspiracy with ADA Quigley" and requested a new investigator. On May 25, 2012, Hayes told Judge Lam that he wished to "delete" Murphy as his investigator and needed the services of a paralegal. On the same date, he again wrote to Judge Lam apologizing "for appearing to be disrespectful in your courtroom," and explaining that "[i]t is the conspiracy's strategy to make this happen, in attempt to deny me my right to self-representation as happens to me for over 9 months." He accused Murphy of "*not* working in my interests," reiterated that he was "*not waiving time*" and accused Quigley and Murphy of "working together to try to get me to waive time." In a second letter on the same date, Hayes accused Murphy of not maintaining Hayes's confidentiality and of having a conflict of interest, and asked that the court relieve him and either provide a new investigator or allow Hayes to hire one. Hayes submitted a proposed order appointing Stanley Goff as his paralegal to assist him in filing a "motion to disqualify the District Attorney's office from his case," appointing Hayes a new investigator and ordering Murphy to turn over Hayes's file to the new investigator.

At a hearing on May 29, 2012, Hayes again told Judge Lam that he had a conflict of interest with Murphy. He sought appointment of a new investigator. "I want an investigator who works for me and is not working with the DA." Hayes also indicated that he wished to subpoena his former attorney Randall Martin to testify at his trial because "he has been participating in the conspiracy with the complainant and her

20

associates to cause this action." He indicated that Quigley was also involved, and he would seek to disqualify Quigley on that basis.

On May 30, 2012, Judge Lam declined to relieve Murphy but assigned Stanley Goff to provide paralegal assistance to Hayes. Despite Hayes's obvious delusions of an ever-broadening conspiracy that now included the assistant district attorney prosecuting his case, a former attorney representing Hayes in the criminal battery case, his former attorney in this case, and the court-appointed investigator assisting him in this case, the court did not question either Hayes's competency to stand trial or his competency to represent himself.

On June 6, 2012, the case was assigned to Judge Dekreon for trial. At a pre-trial hearing that day before Judge Dekreon, Hayes sought "the admission that Mr. A.D.A. Quigley acted in conspiracy against Mr. Hayes" on the ground that "Mr. Quigley conspires with Jason and [Crawford], Steve Cappellini, George Gascon, Randall Martin, Evan Budaj and others against Mr. Hayes."

On June 7, 2012, during discussion of the prosecution's motions in limine (Hayes made none of his own), the court ordered that during jury voir dire, neither defense nor prosecution could "talk about a third person being responsible for the crimes." Hayes made clear that his defense would involve theories of entrapment and conspiracy:

"MR. HAYES: So long as it's clear I have entrapment defenses, conspiracy.

"THE COURT: I'm not talking about the trial itself. I'm talking about voir dire and I'm talking about opening statement.

"Do you understand? Whether you agree with me or not, that's my order.

"Do you understand?

"MR. HAYES: I need to clarify. I do intend to ask the jurors whether they understand the concept of conspiracy.

"THE COURT: There is no conspiracy in this case, sir, and I will preclude you from asking that question.

"MR. HAYES: There is a conspiracy.

"THE COURT: I am ordering you not to ask that question.

21

"MR. HAYES:  Well, do I get to address that at trial?  [¶] . . . [¶]

"THE COURT:  If the evidence comes up as a conspiracy, you can address it in your closing argument only.

"MR. HAYES:  Well, how do I prove it?

"THE COURT:  That's your job.  That's your job."

Hayes said he planned to call Martin and Budaj to testify concerning "why they suspended my proceedings illegally"—a part of a "major conspiracy" against him and "a setup to railroad me into Napa."  Judge Dekreon informed Hayes that such testimony would not be relevant to the charges against him.  Later in the hearing, Hayes asked: "When is the last day to do a preemptory [*sic*] challenge against the judge?"  The court informed Hayes, "That's passed."

On June 8, 2012, Hayes wrote a letter to Judge Dekreon, stating:  "[T]he D.A., Quigley, etc. are aiding in an *extreme* state of conspiracy.  The D.A. has been working with private operators and the police to cause/instigate domestic violence situations and then charge and prosecute as a means of political takedown.  I am assuming you are acting within what I am now percieving [*sic*] to be a generalized prejudice and abuse of pro-per litigants.  If you are further involved please remove yourself and proceed as you seem to be a fair judge likely unduly influenced by Quigley's antics.  He is just scared of the truth.  Because it will mean his disbarment.  It was nice to meet you.  Thanks, Greg Hayes."  Enclosed with the letter is a handwritten "Pre-emptory [*sic*] challenge relieving Judge Dekreon."  The court denied the motion.  A jury was selected on June 11, 2012. That day, Hayes filed requested jury instructions on the following defenses:  entrapment, necessity, voluntary intoxication, "[d]efendant victim of conspiracy," defense of property and "1st Amendment Free Speech."  All but one of Hayes's proposed defense instructions were predicated on the jury accepting his delusions as reality.  For example, his requested conspiracy instruction was:  "To prove that the defendant is in fact the victim of a criminal conspiracy, the defense must present substantial evidence of an agreement, or mutual understanding, or common goal to falsely cause Mr. Hayes'[s] arrest, subject him to unnecessary competency proceedings, defraud him of his liberty,

22

professional reputation and property and obstruct and pervert justice." He filed a witness list containing 26 names "and *all* police officers listed on *all* police reports." The list of names included Jason Crawford, Steve Cappellini, Budaj, Martin, Quigley "(after disqualification)," San Francisco District Attorney George Gascón, Sheriff Ross Mirkarimi, John Avalos, Christine Olague (members of the San Francisco Board of Supervisors) and Matt Gonzalez (Chief Deputy Public Defender).

Judge Dekreon did not raise the question of Hayes's competence to stand trial during any of the pretrial proceedings before her.

## VII.

### *The Prosecution's Case at Trial*

Presentation of evidence began on June 12, 2012. Crawford was the first witness for the prosecution, and she testified to the facts we summarized above. She denied knowing people named Steve Cappellini or Jason Crawford.

Hayes began his cross-examination by introducing into evidence one of the e-mails he had sent to Crawford. The e-mail referenced "Iowa library privatizers" and "the king of Saudi Arabia" and Crawford did not know what that was about. It also contained lyrics to a song that Crawford found "disconcerting and frightening." Hayes asked Crawford "You support the privatization of Iowa libraries?" and the court sustained an objection.

Hayes then had Crawford read an e-mail he sent her that said: "Hi, Mom. Please download and place on a disk ASAP. Someone has hacked into my account and is erasing songs. People have been telling me that [Crawford's] new boyfriend . . . ." The prosecutor objected that the e-mail was "self-serving hearsay" and the court told Hayes: "You cannot testify during cross-examination. You cannot elicit your testimony during cross examination."

Although Hayes cross-examined Crawford for several hours, the primary points he attempted to make were that his e-mails contained works of fiction and that they were really addressed to persons other than Crawford, the persons he believed were harassing him. For example:

"Q: So you recognize what's fiction?

"A: Potentially.

"Q: Literary devices? [¶] . . . [¶]

"A: Devices, yes.

"Q: Allegory? [¶] . . . [¶]

"A: Yeah.

"Q: [A]llusion, metaphor and that kind of thing?

"A: Potentially, yes.

"Q: So Mr. Hayes[7] called you Angelshine; is that correct?

"A: I can't remember if that's consistently throughout your e-mails, but yes, at times.

"Q: Sometimes he calls himself the Songwriter?

"A: Correct.

"Q: And he also calls himself Mr. Haze with a z; is that correct?

"A: Correct.

"Q: And you the Librarian?

"A: Correct.

"Q: So Mr. Hayes had been sent by English as a songwriter; is that correct?

"A: I don't recall specifically the contents of all the e-mails. Sorry. [¶] . . . [¶]

"Q: So assuming that Mr. Hayes is supposed to bring the songwriter back to the international superman; is that correct? [To which an objection was made and sustained.] [¶] . . . [¶]

"Q: So are you an angel?

"A: Not to my knowledge.

"Q: Are you in an international superman?

"A: I am not.

"Q: Do you know anything about inter dimensional psychic disturbances?

---

**7** Hayes often referred to himself in the third person when questioning witnesses.

"A: No.

"Q: Do you know anything about quantum entanglement?

"A: No.

"Q: Is Mr. Hayes a songwriter?

"A: Yes.

"Q: Is he a love songwriter?

"A: I do not know.

Hayes concluded this line of questioning with the question: "Would you appreciate these characters being an aspect of a literary work?" He later asked: "About that time, he started to fictionalize past events in e-mails to you; is that correct?"

Hayes also had Crawford read into the record an e-mail in which Hayes related that he had problems with computer security and something had "disappeared from [his] account." Crawford read another e-mail that said: "The police are possibly reading my e-mail without a warrant. I think one or more of the people involved is harassing me, may have worked as investigators in the county before. The harassment is intensifying." A further e-mail stated that a third party may have "blow[n] out" Hayes's computer processor.

Hayes also asked Crawford about Steve:

"Q: Did you ever have sex with Steve?

"A: No.

"Q: Did you have a relationship with him?

"A: We were just friends.

"Q: Did Steve try to get Mr. Hayes to kill himself?

"A: No.

"Q: Did Steve tell a bunch of people in the neighborhood that Hayes had herpes and was HIV positive?

"A: No.

"Q: Did Steve and his friends threaten to break or re-break Greg Hayes'[s] neck?

"A: No.

25

Hayes asked Crawford if her husband's name was Jason, and she answered "No."

The second witness for the prosecution was Mari Pellegrino.[8] Pellegrino met Hayes at Hayes Valley Farm in April 2011. Hayes invited Pellegrino to his apartment, which was across the street from the farm. Pellegrino went to Hayes's apartment and they kissed. Hayes tried to take her shirt off, but she told him, "We're not having intercourse and everyone needs to keep their pants on." Pellegrino testified: "He kept trying to take my pants off. He was holding me with his hand on my neck. I had bruises on my neck and on my wrist. And he was becoming very physically agitated and aggressive. [¶] I was able to keep my pants on. He took his pants off and put his hand on my wrist and basically forced me to give him a hand job. [¶] Several times I unclenched my hand. I did not want to be doing this, and he was aggressive, and he wanted me to continue, and I was afraid and thought this is the only way I can get through this situation is for him to relieve himself and hopefully it will be over." An e-mail exchange between Hayes and Pellegrino ensued. Pellegrino stated in one e-mail message: "Greg, let me be very clear. I do not want you to contact me again." Hayes continued to send e-mail and Pellegrino consistently responded that she did not appreciate the contact, finally writing to him that she had filed a police report and that if he tried to contact her in the future, she would obtain a restraining order. Hayes sent Pellegrino two more e-mails, but then his contact ceased. That Hayes continued to send her e-mail after she told him to stop made her feel "[i]gnored and bullied and afraid." Hayes sent Pellegrino between 12 and 15 e-mails in total.

During his cross-examination of Pellegrino, Hayes asked if he had ever referred to her as Angelshine or Librarian, whether he had ever told her "about his international superman," and whether he had any knowledge of quantum entanglement, or she had "any knowledge of international psychic disturbances." Hayes asked her about borage, "the leafy green vegetable that you really, really liked that we picked and then took over

---

[8] Hayes did not make a motion in limine to exclude Pellegrino's testimony or object to it at trial (though he did object to documents the prosecution asked Pellegrino to look at).

to my house before the incident," questioning about the color of its flowers and whether they tasted good.

The prosecution's third witness was Sergeant Marty Lalor, the police officer who arrested Hayes. When Hayes was arrested he had a knife in his pocket. He also had a cell phone that contained photographs of a knife like the one seized from him. On cross-examination, Lalor agreed that the knife was legal and could be used for legitimate purposes.

The prosecution's fourth and final witness was Keane, who testified concerning his interviews with Crawford. It was Keane who obtained a warrant for Hayes's arrest. On cross-examination, Hayes tried to elicit testimony that would confirm his conspiracy theory:

"Q. Are there any confidential informants involved in this case? [To which an objection was raised and sustained.] [¶] . . . [¶]

"Q: Who is Steve Cappellini?

"A: I don't know.

"Q: And who is Jason Crawford?

"A: I don't know.

"Q: Isn't Jason Crawford [Crawford's] husband?

"A: I don't know.

"Q: No? Was anybody else involved in this investigation with you besides [Crawford]? [¶] . . . [¶] Any other non-police personnel.

"A: The district attorney, a judge, clerk who typed up the warrant.

"Q: Well, any other private citizen basically?

"A: No.

"Q: Were you in contact with Evan Budaj? [¶] . . . [¶]

"A: No."

Hayes repeated this line of questioning later in his cross-examination of Keane. Hayes also cross-examined Keane concerning complaints that had been made against him

by individuals associated with Hayes Valley Farm. Hayes had altercations with these individuals, and additional restraining orders against Hayes had resulted.

## VIII.

### *Trial Proceedings Regarding Hayes's Attempts to Subpoena Defense Witnesses*

After the prosecution rested, the court considered motions from the public defender's office to quash Hayes's subpoenas of his former appointed attorneys Budaj and Martin, and of Chief Deputy Public Defender Gonzalez. Hayes argued that Martin and Budaj "conspired to pervert justice" in his case "by suspending . . . proceedings without any factual or legal investigation six days" after Hayes's arrest. Hayes then proceeded to address the court concerning injustices he perceived to have taken place in connection with the competency proceedings and ensuing proceedings, including the trial—an address that takes about 24 pages in the reporter's transcript. All of these injustices were part of his perception of a conspiracy: "What happened is this is a designed prosecution, and what it is you like build up a bunch of police reports about somebody by slandering them and setting them up and instigating conflicts, and then those police reports are put into the record, and then if they say somebody's doing this to them, you refer them as incompetent, and then when they say that they are found to be incompetent because it seems delusional because it fits into delusions which would be found in the DSM-IV such as like paranoid persecutory delusion." "This is classic crazy, crazy kind of things that are like—that have some, I mean, obvious conspiracy characteristics. This is a classic maneuver of intelligence agencies to harass someone till they seem insane or become insane and get them committed. It's classic. It totally diverts you and completely takes away all your due process. [¶] So you're hanging out, the computer's blowing up, you got people getting in fights all over the place, and everything is going crazy, right? You know. [¶] And you decide that the only person you have any connection to this, you know, is just going to start talking shit into her e-mailing, sending pictures of your dick and drunk, fucking knives and all this stuff. Whatever, you know. [¶] Before it was just writing stories to kind of like try to figure out what's going on, you know. It's a pretty good setup. Pretty frickin' good setup."

28

The court ruled that "the information in the offer of proof or showing as to what the testimony would be elicited from these three potential witnesses all goes to conduct that occurred after June 18, 2011 [the final date covered by the information]" and granted the motions to quash. The court informed Hayes: "The purpose of the subpoena is to put on evidence of a conspiracy, which is not a defense to these charges and is not allowed." Hayes objected: "I want to clarify it's relevant because it's basically the result of the conspiracy. That's how it was designed. [¶] It was specifically designed for that purpose for committing me without any due process immediately, and that's specifically what happened. [¶] So I think your ruling is faulty in that regard, . . . —you're just saying the result of the setup isn't evidence of the setup, and that's kind of like just like I don't know. [¶] Like can you explain any of these facts that happened here?"

On Friday, June 15, 2012, the court told Hayes, "Today is the day for you to present witnesses and/or for you to testify." Hayes said, "I don't have witnesses today, and I'm not prepared to testify myself because nobody is here. [¶] Mr. Murphy has not delivered all the subpoenas." Murphy reported to the court on his attempts to serve subpoenas. Hayes said he wanted to recall Crawford as a defense witness: "I want to question her about like the abusive process that was evidenced in the initial restraining order and whether she's aware of the sort of liability she faces for that, and just pretty much whether she's aware of what she's doing. Because it's really extreme abuse of my life essentially in a situation where I don't have any other option but to figure out who is harassing me, and I think it's completely unreasonable to answer somebody who is asking for you to contact an attorney, who is asking you to contact their mother saying my computer is blown up and please do something when they have no other option except act out of necessity to contact you." The court refused to recall Crawford because "[n]one of those questions are relevant."

The prosecutor questioned whether any witness on Hayes's witness list could offer relevant evidence. The court then proceeded to ask Hayes for an offer of proof for each of the witnesses named. Hayes responded, but the court had to repeatedly tell him to calm down and stop yelling. The court ruled that none of Hayes's proposed witnesses

29

had relevant evidence to offer and reminded Hayes that conspiracy was not a defense and "evidence of conspiracy will not be allowed." Again, the court did not question Hayes's competency to stand trial.

IX.

*The Defense Case, Closing Argument and the Verdict*

Hayes testified on his own behalf. He introduced receipts for computer repairs to support his belief that computer "was being hacked into. He then explained the song that was contained in one of his e-mails to Crawford and began singing it. The court told him: "Please testify, sir. [¶] Singing is not testifying."[9] Hayes then proceeded to testify to substantially the same account he gave at the preliminary hearing, from which we quoted extensively above. The court frequently admonished Hayes to testify about something relevant to the case. The prosecutor made numerous objections that were sustained. At one point, the court told the jury to "disregard Mr. Hayes'[s] testimony," at which point the reporter inserted into the transcript: "(Please note that the judge, Mr. Hayes and Mr. Quigley were all speaking (yelling) at the same time. This reporter did the best she could under these extremely difficult and out of control circumstances.)" A great deal of Hayes's testimony consisted of his commentary on e-mail that he had sent to Crawford, such as the following: "So what I was doing is I was like reading this fictional construct into the reality of rounding, particularly in situations where, you know, things have gone kind of wrong. [¶] So like—or to even kind of like see what would happen. [¶] Because the way people responded to me gave me indications about the kind of standard that was going on. [¶] One example, my friend got kicked out of the Hotel Utah." [At which point the court told Hayes to return to relevant matters.]

During cross-examination, the prosecution asked Hayes about his perceptions of harassment:

"Q: [Restraining orders filed in April 2011 were] [p]art of harassment from your perspective, right?

---

[9] The court had to tell Hayes to stop singing again, at a later point in his testimony.

30

"A: Yes. You overload somebody with like conflicts that they're not actually involved in. It's game theory. [¶] You zap their resources, overload them with conflicts, put other people on them. [¶] It's classic CIA kind of stuff.

"Q: Right. You're talking about how overwhelmed that harassment made you feel, right?

"A: That's the purpose of that kind of tactic is to overload the person, to zap their resources and distract them so they're just kind of like dealing with all this stuff instead of living their lives and doing what they could be doing that would make them potentially a more politically active, productive person in society.

"Q: And the only—and you didn't understand how this was coordinated, this harassment, correct?

"A: I was gaining an understanding of it because I was doing like kind of like— you know, listening to people, and I was sending out e-mails to see how people would react. [¶] Like Jay would say certain things, and I'd be kind of like, you know—that would indicate to me that he was reading private e-mails that weren't sent to [Crawford].

"Q: So you're sending out e-mails to people to try to instigate some kind of response?

"A: That and to like re-spin what had happened."

Following Hayes's testimony, the defense rested.

During closing argument, Hayes argued that the conspiracy of harassment targeting him left him with no choice but to act as he did. "The design is I get harassed, react angrily at [Crawford], I'm arrested and then fed into the machine. [¶] But even if you are caught up in this group mentality, what do you do with someone who instead spins a fictional universe into your e-mail? [¶] What do you say when the characters start playing around in the real world revolving around in curiosity talking about drag queens and library privatizers and wanting to be a cop and singing songs? [¶] What do you think? What do you do with somebody who starts singing on the witness stand one minute and screaming at life and death fury at the D.A. the next? [¶] You realize people want to live and people want to sing. [¶] I never threatened [Crawford]. I never

31

physically harmed her in any way. [¶] I needed her to be a reasonable person to tell me what was going on. [¶] I never hit her. I had sex with her four times. [¶] Then instead of telling me who her friends are, who literally ran me out of the city in 2008, who caused me thousands and thousands of damages and then did not stop harassing me, did not stop harassing me at any time since 2008, she put a five-year restraining order on me. [¶] Then it still didn't stop. And she would not contact me like a human being. [¶] Instead, she let people hide behind her and use her as a medium through which to attack me."

Despite Hayes's testimony and closing argument, there was still no question by the trial court concerning Hayes's competency to stand trial.

The jury reached a verdict on the morning of June 20, 2012, finding Hayes guilty on all counts, except count 83, one of the 90 misdemeanor section 273.6, subdivision (a) counts. Hayes declined to waive time for sentencing.

## X.

### *Competency Evaluations Prior to Sentencing*

JPS submitted a report to the court dated July 12, 2012, stating Hayes was currently diagnosed with a delusional disorder and was refusing psychiatric medications. It advised: "JPS suspects that the client is not competent to stand trial and strongly recommends the court pursue a [section] 1368/1369 evaluation." On July 16, 2012, for the first and only time, Judge Dekreon declared a doubt as to Hayes's competency.

At a hearing before Judge Wong on July 18, 2012, Hayes told the court Judge Dekreon didn't "have jurisdiction" to express a doubt and that "[e]verything's going pretty well." The court appointed Daniel Byrne to represent Hayes during the competency proceeding. Doctors Jeko and Kessler were appointed to reevaluate Hayes and again render their opinions.

Kessler's report again expressed doubt that Hayes's belief system was actually delusional. He commented: "Of some interest is his testimony at [the preliminary hearing] that at one point he had met with the alleged female victim who had told him that there indeed was a concerted campaign of harassment directed against him, as he has consistently claimed, although his statements have been viewed as evidence of

32

persecutory delusions." Kessler further opined, "his claim that the female victim in the current charges admitted to him that there was in fact a concerted campaign to harass him would obviously, if true, cast some doubt as to the validity of a current psychotic diagnosis." He believed Hayes was competent *to be sentenced*. Kessler's report did not address Hayes's ability to approach his sentencing hearing in a rational manner, either on his own behalf or with assistance of counsel.

Jeko's report stated that when she attempted to interview Hayes, "he repeatedly, and rather incessantly stated 'I refuse to speak. . . . This is against my rights. . . .' " The attempt to interview Hayes ended after about five minutes. The report further states: "Due to insufficient information, the undersigned is not able to render a fully informed opinion regarding Mr. Hayes'[s] competency to stand trial." She did observe, however, that "[r]ecent records document Mr. Hayes'[s] harboring the paranoid delusions regarding entities in the legal system that include the judge, district attorney and his own investigator. Recent records also document his exhibiting mild hypomania, guardedness and irritability consistent with one suffering from an untreated Bipolar Disorder. He refuses antipsychotic medication or, for that matter, any psychotropic medication that have decreased his paranoid delusions and increased his mental flexibility in the past."

A competency hearing was held before Judge Wong on August 15, 2012. Based on the reports, Byrne and Quigley stipulated that Hayes was competent. The court agreed and reinstated the criminal proceedings.

## XII.

### *Sentencing*

The court appointed Andrea Hartsough as advisory counsel to Hayes for sentencing. The probation department submitted an initial report on July 12, 2012, recommending that Hayes be granted probation. On July 16, 2012, the court ordered a new report because the probation department had reviewed only one of 13 police reports. The court concluded the probation department was "not fully informed." The second presentence report recommended that probation be denied. The People filed a sentencing memorandum, recommending a sentence of six years, eight months in state prison (for

the felony counts), consecutive to six years in county jail (for six of the misdemeanor counts).

The court sentenced Hayes on October 17, 2012. Hayes repeatedly told the court that he "refuse[d] to appear." Finally Hayes said: "I refuse to appear, I will be removed from the courtroom at this time. I refuse to appear. I refuse to appear. I cannot be sentenced by force. I do not have the trial transcripts. Why isn't the court reporter taking this down? I refuse to appear. I will be removed from the courtroom now. I refuse to appear. You cannot do this." The court replied: "Let the record reflect Mr. Hayes is yelling at the top of his voice, four sheriffs deputies are forcing him to sit down."

On counts 1 through 5, the court sentenced Hayes to a total state prison term of six years, eight months.[10] On each of counts 6 through 50, the court sentenced Hayes to six months in county jail, for a total of 22 years, six months, to be served consecutive to the state prison term. Hayes also received six-month concurrent terms for the remaining misdemeanor counts on which he was convicted. Thus, the court sentenced Hayes to 29 years, two months of confinement, well beyond double the 12-year, 8-month sentence recommended by the assistant district attorney. The court ordered that Hayes register as a sex offender, pursuant to section 290.006.

Hayes filed a notice of appeal on August 13, 2012, before a final judgment had been entered in his case. We ordered that Hayes's premature notice of appeal be treated as having been filed immediately after the rendition of the October 17, 2012 judgment. Hayes filed a petition for writ of habeas corpus on May 20, 2014, which we ordered would be considered with this appeal.

## DISCUSSION

In his appeal (as well as his petition for habeas corpus), Hayes argues that the criminal proceedings in his case violated his due process rights[11] because he was

___

[10] This included four years on Count 1, and four consecutive eight-month sentences on counts 2 through 5.

[11] Hayes also contends that the court's failure to address his incompetency and its decision to allow him to represent himself violated his Sixth and Eighth Amendment

34

incompetent to stand trial and incompetent to represent himself.  We agree.  The trial court had a sua sponte duty to hold a competency hearing because there was substantial evidence before it that Hayes was incompetent to stand trial, but it failed to do so prior to the verdict.  We also agree with Hayes that this error requires reversal of his conviction.[12]

## I.

### *Legal Standards*

#### A.  Competence to Stand Trial

"[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." (*Drope v. Missouri* (1975) 420 U.S. 162, 171 [95 S.Ct. 896, 903] (*Drope*)).  The right not to be tried while mentally incompetent derives from the due process clause of the state and federal constitutions.  (*Ryan v. Gonzales*, *supra*, 133 S.Ct. at p. 703; *People v. Hayes* (1999) 21 Cal.4th 1211, 1281; see *Pate v. Robinson* (1966) 383 U.S. 375, 376–378 [86 S.Ct. 836] (*Pate*); *People v. Pennington* (1967) 66 Cal.2d 508, 517–519 (*Pennington*).)  Trying a defendant who is mentally incompetent has been compared to trying someone " '*in absentia*; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself.' " (*Drope*, *supra*, 420 U.S. at p. 171.)  The Supreme Court has described the prohibition as "fundamental to an adversary system of justice." (*Id*. at p. 172.)

---

rights.  We need not address these arguments in light of our determination that the trial court denied Hayes due process in violation of the Fourteenth Amendment and article I, section 7 of the California Constitution.  We note, however, that the United States Supreme Court has held that the right to competence at trial flows from the due process clause, not the Sixth Amendment.  (*Ryan v. Gonzales* (2013) ___ U.S. ___ [133 S.Ct. 696, 703].)

[12]  We therefore do not reach his arguments that his sentence was vindictive, violated the Penal Code and constitutes cruel and unusual punishment.  Nor do we address his challenge to the requirement that he register as a sex offender.  Our conclusion and disposition also renders moot similar arguments that Hayes makes on habeas corpus.

The basic test for competence is well settled. A defendant is deemed competent to stand trial if he has " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . has a rational as well as factual understanding of the proceedings against him.' " (*Dusky v. United States* (1960) 362 U.S. 402, 402 [80 S.Ct. 788] (per curiam) (*Dusky*); accord, *People v. Lightsey* (2012) 54 Cal.4th 668, 690 (*Lightsey*); see also § 1367, subd. (a) ["A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner"].)[13]

The trial court plays a critical role in safeguarding the defendant's due process right not to be tried while incompetent. "Whether on motion of the defendant or sua sponte, the trial court is required to suspend criminal proceedings and hold a hearing to determine competency whenever substantial evidence of incompetence is introduced." (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1281; accord, *Pennington*, *supra*, 66 Cal.2d at p. 518.) Substantial evidence is "evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*People v. Blair* (2005) 36 Cal.4th 686, 711, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919.) Such evidence may be in the form of expert testimony but may also consist in whole or in part of " 'a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial,' " all of which are relevant and any one of which standing alone may be sufficient. (*People v. Ary* (2004) 118 Cal.App.4th 1016, 1024 (*Ary I*), quoting *Drope*, *supra*, 420 U.S. at p. 180.) "Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary." (*Pennington*, *supra*, 66 Cal.2d at p. 518.) " 'Even when a defendant is competent at the commencement of his trial, a trial court must

---

[13] Specific protections against denial of the due process right not to be tried while mentally incompetent are embodied in the Penal Code. (See §§ 1367 et seq.)

always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' " (*Lightsey*, *supra*, 54 Cal.4th at p. 690.) On appeal, "in resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record." (*People v. Young* (2005) 34 Cal.4th 1149, 1217.)

Because a court must "consider all of the relevant circumstances" in determining whether there is substantial evidence of incompetency, defense "counsel's opinion is undoubtedly relevant." (*People v. Howard* (1992) 1 Cal.4th 1132, 1164; *Drope*, *supra*, 420 U.S. at p. 177, fn. 13 [defense counsel is person with " 'closest contact with the defendant[;]' " thus, her opinion "is unquestionably a factor which should be considered"].) However, "[t]he opinion of counsel, without a statement of specific reasons supporting that opinion, does not constitute substantial evidence." (Cal. Rules of Court, rule 4.130(b)(2).)

If a defendant is found to be incompetent at a competency hearing, the court commits the defendant to an appropriate treatment facility for restoration of competency. (§ 1370, subd. (a)(1)(B).) When the director of the treating facility certifies that the defendant has regained competency, the defendant is returned to the court. (§ 1372, subd. (a).) A further hearing is not required and the trial court may summarily approve the certification. (*People v. Mixon* (1990) 225 Cal.App.3d 1471, 1480.) However, defense counsel may challenge the certification and request a section 1369 competency hearing. (*Id.* at pp. 1480, 1482.) Moreover, as already discussed, if substantial evidence thereafter arises suggesting defendant is incompetent, the court must revisit the issue. (See *Lightsey*, *supra*, 54 Cal.4th at pp. 690–691.)

## B. Competency to Represent Oneself

A defendant found competent to stand trial may nonetheless be denied the right of self-representation. In *Indiana v. Edwards* (2008) 554 U.S. 164, 128 S.Ct. 2379, the Supreme Court considered the "gray area" between the "minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher

standard that measures mental fitness for another legal purpose." (*Id*. at p. 172.) The question at issue was whether a state could deny the right of self-representation at trial to a defendant in the gray area without violating the Sixth Amendment. (*Id.* at pp. 173–174.) The Court ruled that a state could do so. (*Id.* at p. 174.) "[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id.* at p. 178.) In *People v. Johnson* (2012) 53 Cal.4th 519, our Supreme Court concluded that "California courts may deny self-representation when *Edwards* permits . . . ." (*Id.* at p. 525.)[14]

## II.

### *The Trial Court's Failure to Hold a Competency Hearing Despite Substantial Evidence of Hayes's Incompetence Violated His Right to Due Process.*

In September 2011, Judge Wong found Hayes was incompetent to stand trial based on the reports of Doctors Jeko and Novak opining that Hayes harbored "clearly evidenced fixed paranoid delusions," his history of mental illness and delusions were indicative of mental illness, he refused to take antipsychotic medications necessary to "loosen" his delusional ideation, and he was determined both to pursue a defense based on his delusional beliefs and not to pursue a mental health-based defense. The trial court agreed with these mental health professionals that Hayes was "unable to assist counsel in the conduct of the defense in a rational manner as a result of a mental disorder." Hayes's comments at the mental competency hearing outlining the defense he intended to present "based upon hacking, based upon third party sabotage, based upon harassment, difficulty detecting them, setting them up to get caught up in the legal system" were, in the court's view, a further indication that he did "not have the ability to assist counsel in a rational

---

[14] The federal due process clause is not violated by allowing a defendant to represent himself so long as he is competent to stand trial; no higher standard of competency is constitutionally required. (*Godinez v. Moran* (1993) 509 U.S. 389, 402 [113 S.Ct. 2680].) The California courts have not addressed whether the state constitutional due process clause (or right to counsel provision) requires a higher level of competency before a defendant may represent herself. We do not reach that issue here.

38

manner at this time" as "the direct result of ongoing thoughts regarding [Hayes's] feeling that [he was] a victim of a conspiracy of harassment."

Five months later (and two months after Hayes was admitted to Napa State Hospital), the court held he was restored to competency based on the hospital's report that—while diagnosing him with Bipolar Disorder with recent manic severe psychotic features, Personality Disorder with antisocial and narcissistic traits and Alcohol Abuse, observing that he exhibited "beliefs and behaviors . . . consistent with Delusional Disorder," and indicating he had been medicated (though had resisted and only been partially compliant) with Risperidone "for psychosis and mood instability"—stated that he understood that his conspiracy theories might not be susceptible of proof to or belief by a jury and that he could think "flexibly" and was willing to abandon those theories if evidence could not be amassed to support them.

Even shortly before and shortly after the court held Hayes had been restored to competency there were red flags indicating that the conditions that had previously led to the court's initial decision holding him incompetent (that he was delusional and intent on presenting a defense based on his delusions) remained, and that the facts on which the hospital's recommendation was based (that he was no longer insisting on a delusion-based defense) were either incorrect or had changed. First, his first appointed counsel, Martin, did not stipulate to the restoration of competency, instead declaring a conflict, which led to the court allowing him to withdraw as Hayes's counsel. When Hayes then sought to represent himself and indicated he would be content with his second appointed counsel, Furst, acting as his advisory counsel, Furst demurred, saying he was disinclined to serve as Hayes's advisory counsel.

After the court granted Hayes's *Faretta*[15] motion, these red flags quickly ripened into serious evidence of Hayes's inability to rationally assist in, much less conduct, his own defense. Beginning with the preliminary hearing, Hayes testified about a delusional conspiracy specifically designed to harass him. His testimony, which we have already

---

[15] *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525].

39

extensively recounted, indicates his delusional thinking was not only continuing but expanding. It encompassed not only the events underlying the charges against him but also the events in the legal proceedings themselves; for example, he testified that his misdemeanor battery defense attorney (Budaj) had participated in the conspiracy against him by raising a doubt about his competency.

Hayes repeated and further expanded on his delusions when he argued for release on his own recognizance, extending the conspiracy to Quigley, the assistant district attorney. In further pre-trial communications with the court, Hayes accused his court-appointed investigator, Murphy, of lying and purposefully giving him false legal advice, adding Murphy to the ever-growing list of people acting in concert against him. In a further pre-trial letter, he apologized to the court for appearing to be disrespectful, explaining that it was "the conspiracy's strategy to make this happen, in attempt to deny me my right to self-representation." At a pre-trial hearing, he added his former counsel, Martin, to the conspiracy, claiming that he had acted in concert with the complaining witness (Crawford). He stated he would seek to disqualify the entire district attorney's office because Quigley and other members of the district attorney's office were engaged in misconduct he viewed as part of the conspiracy.

In pretrial proceedings and at trial before Judge Dekreon, Hayes repeatedly made it clear that his primary "defense" was that he was the victim of a conspiracy. His proposed defensive jury instructions—almost all of which the court rejected—left no doubt about that; nor did his witness list naming, among others, Evan Budaj, Randall Martin, "Nathan Quigley (after disqualification)," "John Keane, and *all* police officers listed on *all* police reports," San Francisco District Attorney George Gascón, San Francisco Sheriff Ross Mirkarimi, San Francisco Supervisors John Avalos and Christine Olague and Chief Deputy Public Defender Matt Gonzalez. The same is true of his attempts to subpoena Budaj, Martin and Gonzalez. In ruling on permissible questions during voir dire and motions to quash Hayes's subpoenas, the court repeatedly admonished Hayes that the alleged conspiracy did not constitute a defense and was not relevant to the case. These admonitions went nowhere, and Hayes's defense strategy at

40

trial remained focused on the harassment he believed he had been subjected to at the hands of everyone from his neighbors to his attorneys to government officials, who were all acting together against him.

Hayes unabashedly adhered to and relied on his delusions of conspiracy as his defense in his lines of questioning and in his own testimony. His questions and his own testimony, as well as the e-mails he had sent to Crawford, were not only bizarre[16] but reflected extreme paranoia.[17] Not surprisingly, apart from his own testimony, Hayes was unable to present any objective evidence—that is, evidence outside his own perceptions and beliefs—to support his theory of a nefarious and metastasizing conspiracy. It was painfully apparent that the conspiracy was real in Hayes's mind, but equally apparent that it was not real.

Finally, Hayes's closing arguments likewise focused on his delusions and in some respects were incomprehensible. He was "intensively harassed," his computer was hacked and blown up, his communications were monitored and intercepted. This was all part of a grand "design" which entailed him being subjected to harassment, reacting in

---

[16] For example, he asked witnesses about the taste of borage and the color of its flowers, the "international superman," "quantum entanglement" and "psychic disturbances."

[17] For example, he asked Officer Keane whether he had been in touch with Hayes's former attorney Evan Budaj at the time he was investigating this matter and asked Crawford whether Steve had tried to get Hayes to kill himself and whether Steve told people in the neighborhood that Hayes had herpes and was HIV positive. On direct examination, he testified he heard neighbors reading or performing both his e-mails he sent to Crawford and e-mails he never sent, and "[t]hey were trying to get people to kick my ass, threaten to re-break my neck again" and "following me around the city saying, 'See that guy over there, he hit a girl and gave her herpes,' . . . ." He testified that shortly before he was arrested, his television started "flashing on and off, and I'm looking up and there's a police helicopter hovering up above looking down into my window. . . . [¶] This was all a plan to make me appear to be crazy. That is what they were doing. That's the nature of the type of harassment." On cross-examination, he testified that the restraining orders were part of the harassment: "Yes. You overload somebody with like conflicts that they're not actually involved in. It's game theory. [¶] You zap their resources, overload them with conflicts, put other people on them. [¶] It's classic CIA kind of stuff."

anger, being "arrested and then fed into the machine." Third parties used Crawford "as a medium through which to attack [him]," he did not threaten her but merely "sp[u]n a fictional universe" into her email. He asked the jury, "What you do with somebody who starts singing on the witness stand one minute and screaming at life and death fury at the D.A. the next?" He answered: "You realize people want to live and people want to sing."

Hayes adhered to his delusions throughout the pre-trial proceedings and the trial—despite the absence of objective evidence supporting them. Likewise he insisted—despite the trial court's repeated rejection of his arguments and exclusion of evidence and jury instructions based on them—that the conspiracy against him provided a defense to the charges. This behavior contradicted the central conclusion of the Napa State Hospital report on which the court's restoration of Hayes's competency was based: that Hayes could "think flexibly" and was prepared to abandon a defense based on his delusions if they could not be supported by evidence. At no point did Hayes offer the defenses his prior counsel had suggested (which he had consistently rejected): that his delusional mental state at the time he engaged in the conduct for which he had been charged negated the intent element required for the charged offenses or that his mental illness in whole or in part excused his conduct.

Hayes's history of mental illness, the reasons for the court's initial finding that he was incompetent, the bases on which he was determined to have been restored to competency, and the restoration report stating he was only partially compliant with his medication regimen, in conjunction with the primary defenses Hayes offered throughout the pre-trial proceedings and trial, should have caused the court to seriously doubt his competency at numerous points prior to the jury reaching a verdict. Substantial, indeed considerable, evidence showed Hayes, as a result of his mental disorder and paranoid delusions, was unable to assist counsel in his defense, much less conduct his own defense, in a rational manner. Yet, at no time between the restoration of competency ruling and the verdict did the trial court declare a doubt, suspend the proceedings and hold a competence hearing. Recognizing the significant deference we afford the trial

42

court on this issue, we nonetheless conclude the court abused its discretion by failing to declare a doubt as to Hayes's competence to stand trial during that period of time.

*People v. Murdoch* (2011) 194 Cal.App.4th 230 (*Murdoch*) is analogous. Murdoch was charged with assault with a deadly weapon and battery with serious bodily injury. (*Id.* at p. 233.) On his second court appearance, the magistrate ordered a competency examination and appointed a psychologist and a psychiatrist to examine him. (*Ibid.*) Both found Murdoch suffered from severe mental illness but concluded he was competent to stand trial because of medication he had been prescribed. (*Ibid.*) However, Murdoch had informed the examiners he did not always take the medication or that he had stopped taking it, and they opined that he could become incompetent if he continued to refuse medication. (*Ibid.*)

The trial court nonetheless found Murdoch mentally competent and reinstated proceedings. (*Murdoch*, *supra*, 194 Cal.App.4th at p. 234.) The public defender declared a conflict of interest, and the court appointed another public defender to represent Murdoch. (*Ibid.*) Defense counsel did not state a doubt as to Murdoch's competence, and Murdoch subsequently requested to represent himself. (*Ibid.*) The court granted his request. (*Ibid.*)

During pretrial proceedings, Murdoch sought to have pages of the Bible marked as exhibits. (*Murdoch*, *supra*, 194 Cal.App.4th at p. 234.) When the court inquired as to why, he told the judge: " 'What I have to do here is I have to demonstrate that there's something else going on in this world that people are aware of. I'm going to make allegations about the plaintiffs in this case that they aren't even human, and that they're—' " (*Ibid.*) The judge interrupted, asking " 'The defense is they're not human?' " (*Ibid.*) Murdoch confirmed that was his defense. He stated further that he intended to ask the witnesses if they " 'are from Sodom and Gomorra,' " asserting that they are " 'not human,' " that they lacked shoulder blades and could not shrug their shoulders and that shoulder blades " 'are symbolic of angelic beings.' " (*Ibid.*)

At trial, the victim of the assault testified that Murdoch had struck the back of his head with a beer bottle and pummeled him with fists. (*Murdoch*, *supra*, 194 Cal.App.4th

43

at p. 235.) When it came time to cross-examine the victim, Murdoch stated he was unsure whether the witness was " 'the imposter.' " (*Ibid.*) Upon instruction from the court to " '[j]ust ask the question,' " Murdoch "asked his only question: 'Can you shrug your shoulders like this?' [The witness] did and defendant stated, 'That's all I have. This isn't the man that I believe attacked me.' " (*Ibid.*) The defendant was convicted and sentenced to three years in state prison. (*Ibid.*)

On appeal, the court reversed Murdoch's conviction, holding there was substantial evidence raising a reasonable doubt about his competence and that the trial court erred in failing to conduct a competency hearing. (*Murdoch*, *supra*, 194 Cal.App.4th at pp. 236-239.) Citing *People v. Rogers* (2006) 39 Cal.4th 826, 847, the court recognized that the federal due process clause and state law " 'require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial.' " (*Murdoch*, at p. 236.) Recognizing that " ' " '[m]ore is required to raise a doubt [of competence] than mere bizarre actions [citation] or bizarre statements [citation] . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation],' " ' " the court found " 'more' exist[ed]" in Murdoch's case. (*Id.* at pp. 236–237.)

Specifically, the psychologist and psychiatrist had connected Murdoch's competence to his medication, observed that his competence was dependent on his taking it and reported that he had stopped or was not consistently taking it. (*Murdoch*, *supra*, 194 Cal.App.4th at p. 237.) Murdoch's bizarre statements at trial were not in isolation but in the context of knowing he had a mental illness and had stopped taking his medication. (*Id.* at pp. 237–238.) There was no evidence indicating Murdoch's bizarre statements were an attempt to feign incompetence or to delay the proceedings, or were the product of " ' " 'sheer temper.' " ' " (*Id.* at pp. 237, 239.) On the contrary, those statements "w[ere] his *defense*." (*Id.* at p. 239.) Further, the psychologist stated in her report that Murdoch had an explanation for his conduct that was rational, whereas the

defense he revealed at the preliminary hearing and employed at trial was not. (*Id.* at p. 238.) In short, the court concluded: "[Murdoch's] statements taken together with the experts' reports provide the substantial evidence necessary to demonstrate a reasonable doubt as to whether he had in fact decompensated and become incompetent as the experts had warned. Even if we were to assume this evidence was not enough to demonstrate the requisite reasonable doubt as to defendant's competence, given the record before the court demonstrating defendant's gossamer competence, the court should have made an inquiry to determine whether defendant had, in fact, continued to refuse medication." (*Ibid.*)

Significantly, in *Murdoch*, the court recognized the absence of any indication that Murdoch did not understand the nature and purpose of the proceedings. (*Murdoch*, *supra*, 194 Cal.App.4th at p. 239.) However, it observed that competence means the defendant is able both to understand the proceedings " '*and to [assist in or] conduct his own defense in a rational manner.*' " (*Id*.) The evidence "established a reasonable doubt as to whether [Murdoch] could conduct his own defense in a rational manner," and "the trial court erred in not conducting a hearing to determine his competence." (*Ibid.*)

This case is similar in key respects to *Murdoch*. Beginning with the preliminary hearing and continuing as proceedings progressed, it became clear that Hayes's delusional thinking controlled his approach to the case and that the state hospital's and court's reasons for concluding he had regained competency were no longer (if they had ever been) valid. Like *Murdoch*, Hayes's bizarre statements and inappropriate behavior in court were not out of the blue; they were in the context of Hayes having suffered from serious mental illness that had led to repeated hospitalizations and a prior determination that he was incompetent. Similar, too, is the fact that the initial reports on which the court relied to hold Hayes incompetent suggested medication would aid in restoring competence, the court authorized involuntary administration of medication, and the restoration of competency report indicated Hayes had been on antipsychotic medication but was not fully compliant. Yet there is no indication that the court, at any time between the restoration determination and the verdict, questioned whether Hayes was taking the

45

recommended medication despite his repeated expressions of delusional thinking. (And, as later became apparent, he was not.) Also as in *Murdoch*, there was no indication that Hayes sought, through his tactics, to feign incompetence in order to delay or disrupt proceedings. Indeed, Hayes did not waive time for trial when he had the opportunity, repeatedly and vociferously denied he was ever incompetent, and objected to the competency proceedings that did occur—proceedings he regarded as further evidence of the conspiracy targeting him. Nor did Hayes present his delusional defense out of spite or anger at the trial judge—he insisted on it from the beginning of his case and never wavered.[18]

The People attempt to distinguish *Murdoch,* arguing the defense Hayes presented, unlike that in *Murdoch,* "was not completely bizarre and outside the realm of possibilities" and that Hayes even "adduced some evidence of his conspiracy-of-harassment theory."[19] This argument is fatuous. Indeed, at trial, the assistant district attorney argued that Hayes had never provided "any actual documentation or any kind of evidence that would suggest there is any kind of conspiracy."

Now, by contrast, the People cite portions of Hayes's e-mails to Crawford and Hayes's own trial testimony to suggest there could have been a conspiracy. Hayes's subjective beliefs that there was a widespread conspiracy to make him appear crazy and have him committed did not prove that such a conspiracy was real any more than Murdoch's beliefs, had he testified to them, would have proved that the victims of his

---

[18] Indeed, Hayes continued on appeal to assert that he was not incompetent and was capable of representing himself and that attempts to portray him as incompetent were part of the harassment and a "maneuver [that was] at the crux of the conspiracy" against him. We denied his request to represent himself on appeal.

[19] The evidence the People point to predominantly consists of Hayes's own beliefs that he was being harassed, not actual evidence of such harassment, much less of any conspiracy. That Hayes believed he was being harassed by an ever-expanding group of people acting in concert tends to prove, not disprove, that he was delusional. To the extent the People point to evidence that persons Hayes had accosted spoke with others about his behavior, such facts do nothing to refute the considerable evidence of his delusional thinking.

assault were from Sodom and Gomorrah and not human. Neither set of beliefs were rational, and neither was supported by any objective evidence.

Moreover, if the People mean to argue that there was evidence showing Hayes was not delusional, they are not only unconvincing but off the mark. The question is whether there was *substantial evidence* that Hayes was delusional, not whether there was any evidence to the contrary. The evidence in this case, including Hayes's e-mails, his testimony, and other aspects of his defense overwhelmingly demonstrated that his belief system was delusional, and seriously so. This includes his belief that so many different people had conspired in an effort to make him appear crazy—from Crawford, her associates and neighbors, to police, the district attorney's office (including Quigley), his own attorneys (Budaj and Martin) and his investigator (Murphy) in the case. It includes his beliefs that the conspirators had hacked into his computer, were reading his e-mails and attempting to interfere with his study for the bar examination; that they had caused his computer to blow up; that they were reading his sent and unsent e-mails and laughing at him outside his window; that (as evidenced by his letter) the district attorney would take action to investigate the conspiracy and would involve the FBI; that part of the conspiracy's object was to declare him incompetent and send him to the state mental hospital; and that the conspiracy was part of a political plot and involved tactics used by the CIA. It was plain from the evidence in this case (or lack of it) that there was no such conspiracy other than in Hayes's own mind and that Hayes's delusion that there was such a conspiracy deprived him of the ability to rationally comprehend that no jury or judge would believe there was such a conspiracy, much less accept that it necessitated or justified his criminal acts.

Just as in *Murdoch*, Hayes's delusions in this case *were* his defense: he consistently offered them as such from the preliminary hearing through the trial, just as he had done at the outset of the case with the result that he was found incompetent. This could not, or should not, have escaped the notice of Judge Dekreon, who limited Hayes's questions to the jury on voir dire, quashed subpoenas (including those directed to political officials), refused to let him recall Crawford, ruled that other witnesses had no relevant

evidence to offer, attempted repeatedly to redirect him to relevant matters on direct examination, sustained objections to his questions, struck portions of his testimony and his closing argument and declined to give many of his proffered jury instructions—all because, as she repeatedly advised Hayes, the conspiracy he was attempting to prove and argue did not and could not constitute a defense. Hayes's continued reliance on a conspiracy defense, despite Judge Dekreon's repeated warnings and rulings, is further evidence that he was unable rationally to defend himself.

The court in *Murdoch* concluded that the combination of a delusional defense at trial, in combination with knowledge that Murdoch had a serious mental illness, was competent when he was taking his medication, and may have ceased or was inconsistent in taking the medication, constituted substantial evidence that Murdoch was incompetent. A similar cluster of considerations constitutes substantial evidence that Hayes was incompetent throughout the criminal proceedings in this case: he mounted a bizarre and legally untenable defense, was known to have a serious mental illness, had demonstrated an inability to work cooperatively with counsel, was considered competent only because the state hospital thought he could think flexibly and would abandon a defense based on his conspiracy theory absent evidence to support it, and contrary to the state hospital report insisted on pursuing the delusional conspiracy defense without evidence and in the face of repeated warnings that it was irrelevant to any viable defense. Further, as the state hospital report noted, he had been resistant to medications and only partially compliant even when he was at the hospital.

Here, there were multiple points at which the court erred in not raising a doubt and holding a hearing to determine Hayes's competence. The court should have done so after the preliminary hearing when it was apparent that Hayes was intent on pursuing his conspiracy defense. It should have done so following the various pre-trial proceedings during which his correspondence with the court, purported firing of his investigator, allegations that the police, district attorney and his own counsel and investigator were involved in the conspiracy, and arguments about the relevance of certain discovery all showed that the focus of his defense was a factually implausible and legally untenable set

48

of delusions. Again, the court should have declared a doubt following the early part of the trial where Hayes's arguments regarding voir dire, submission of proposed jury instructions and submission of a witness list made plain that the report leading to the ruling that his competence was restored was based either on an assessment that was inaccurate at the time or on circumstances that had changed entirely in the interim. Hayes was neither flexible nor willing to abandon his factually unsupported delusion-based defenses, which he was as mired in as he had been at the outset of the case when he was found incompetent. Indeed, his delusions had expanded to encompass an investigator and the lawyers on both sides of the case.

The court should also have declared a doubt when Hayes's cross-examinations at trial, his own testimony, his attempts to subpoena witnesses during trial and his closing arguments all evidenced his continued focus on an irrational and delusion-based defense. At all of these points, the court could and should have revisited his competence, and its failure to do so violated Hayes's right to due process.

The People argue that Hayes was competent and that, in any event, the trial judge found him to be competent, and we must defer to her finding. Indeed, the People go so far as to suggest that because a number of judges presiding over various hearings in the case failed to declare a doubt, this demonstrates that Hayes was in fact competent. Both arguments lack merit.

As to the first, the People focus on the fact that Hayes had attended law school and was able to prepare and submit jury instructions, make objections (including some that were sustained), cross-examine witnesses and perform other courtroom tasks in a competent manner. The People's argument addresses only the first prong of the competency standard: that the defendant be able to understand the nature of the proceedings and his status in the proceedings. While Hayes apparently came to believe the proceedings themselves were tainted by the conspiracy if not a part of it, we cannot say that there was substantial evidence that he was unable to understand them. But the People fail convincingly to address the second prong of the competence standard, which must also be met: that the defendant be able "to assist counsel in the conduct of a defense

49

*in a rational manner.*" (§ 1367, subd. (a), italics added.)  The defendant must meet *both* prongs of the test to be considered competent.  (*Murdoch*, *supra*, 194 Cal.App.4th at p. 239.)  Whether or not Hayes could cross-examine a witness or object to evidence, his efforts at trial were focused on presenting a defense consisting of a legally irrelevant and factually nonsensical proposition, rooted in his delusions, that there had been a vast conspiracy against him by many people that essentially forced him to act as he did.  Because of his delusions, he could not and did not assist counsel, much less himself, in pro per, in conducting his defense "in a *rational* manner."  (See *Dusky*, *supra*, 362 U.S. 402, 402 [" it is not enough for the district judge to find that 'the defendant (is) oriented to time and place and (has) some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' "].)

The People's second argument—that we must defer to the court's determination that Hayes was competent—is incorrect for several reasons.  Judge Dekreon stated, at the time she declared a doubt based on concerns expressed by jail psychiatric staff, that in her view defendant was "competent during the course of the trial."  However, this was not a finding based on the kind of evidence and adversarial proceeding to which the statutes and constitution entitle a defendant when there is a doubt about his competence.  Indeed, no psychologist or psychiatrist had opined on the issue since near the outset of the case.  Nor had counsel even been appointed, much less presented argument, on behalf of Hayes in regard to his competency during trial.

It is true, of course, that once Hayes had been restored to competency, the trial court was not obligated to initiate a second competency proceeding absent " 'a substantial change of circumstances or . . . new evidence' casting serious doubt [on the finding that defendant was competent]."  (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.)  But by the time of trial, it should have been obvious to anyone familiar with the prior competency proceedings that the facts described in the restoration report either had changed or were inaccurate.  The first set of opinions, which indicated Hayes was insistent on presenting a delusion-based defense, had led to a finding of *in*competence.  The second—the

50

restoration report by Napa State Hospital—concluded Hayes had been restored to competency based on the belief that Hayes could be "flexibl[e]" in his approach to the case and was willing to abandon a conspiracy-based defense if evidence could not be found to support that theory.

The trial court did not grapple with the circumstances as they existed at the time of trial, much less how those circumstances compared to the facts that were the basis for the restoration of competency determination. The judge did not discuss the elephant in the room during the trial that belied any contention that Hayes met that standard: i.e., that he perseverated on his delusions as his core defense; that he did so in the face of having previously been held incompetent based on those very same delusions, rendering him unable to assist in a rational defense; that Hayes's mental state at trial was 180 degrees different from that described in the state hospital report upon which the restoration of competency was based. And finally, the judge did not explain how Hayes's delusion-based defense or his decision to rely on it—even though the court had repeatedly warned him it was not a defense to the charges—could possibly have demonstrated Hayes's ability to assist in (or present) his defense *in a rational manner.*

In short, the trial judge did not follow the statutory procedure, apply the governing legal standard or address the relevant evidence in stating her view. Under these circumstances, her conclusionary statement carries no weight.

Finally, the state asserts that the competency determination made at the time of sentencing should answer the question before us. It does not. It was only after the trial that Judge Wong appointed professionals, held a hearing and determined Hayes was competent. Were the issue Hayes's competence to be sentenced, we would be required to defer to Judge Wong. But the issue here is whether Hayes was competent to stand trial, not whether he was competent to be sentenced. Judge Wong made a finding only as of the time of sentencing and only as to Hayes's competence for purposes of sentencing. Neither the psychiatrists (Kessler and Jeko) nor Judge Wong were engaged in a retrospective attempt to determine whether Hayes had been competent to defend himself or assist in his defense prior to or during the trial. There is no indication that they

51

inquired as to Hayes's defense of himself at trial. Judge Wong's decision thus simply does not bear on the question of Hayes's competency to defend himself (or assist in his defense) at trial.

## III.

### *The Trial Court's Violation of Hayes's Right to Due Process Requires Reversal of His Conviction.*

The failure to hold a competency hearing when there is substantial evidence that a defendant is incompetent has rarely, if ever, been held to constitute harmless error. In *People v. Pennington*, *supra*, 66 Cal.2d 508, 521 and *People v. Stankewitz* (1982) 32 Cal.3d 80, 94, the California Supreme Court held that erroneous denial of a competency hearing "is *per se* prejudicial." (*Accord Ary I*, *supra*, 118 Cal.App.4th 1016, 1028 ["it is certainly the case that the trial court's error in failing to hold a competency hearing when one is warranted is not subject to harmless error review"]; *cf. Lightsey*, *supra*, 54 Cal.4th 668, 699 [allowing potentially incompetent defendant to represent himself during competency hearing was structural error and thus reversible per se].) Generally, the courts have held the appropriate remedy for a trial court's failure to hold a competency hearing is reversal of the conviction. (*People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1280–1281 [citing *Pate*, *supra*, 383 U.S. 375, 386–387; *Dusky*, *supra*, 362 U.S. at p. 403; *Stankewitz*, at p. 94; *People v. Superior Court* (*Marks*) (1991) 1 Cal. 4th 56, 70–71; and *People v. Hale* (1988) 44 Cal.3d 531, 541].)

However, in recent years, our court and our sister courts have grappled further with the remedy for failure to hold a competency hearing, reaching different conclusions on whether such a due process violation may sometimes be cured through a retrospective competency hearing. (Compare *Ary I*, *supra*, 118 Cal.App.4th at pp. 1028–1029 [remanding for consideration whether retrospective competency hearing was feasible and, if so, holding such hearing] and *People v. Kaplan* (2007) 149 Cal.App.4th 372, 387–389 [same] with *People v. Johnwell*, *supra*, 121 Cal.App.4th at p. 1280 [holding erroneous denial of a competency hearing that comported with due process required reversal and retrial and could not be cured by retrospective determination of defendant's mental

52

competence during trial].) In *People v. Ary* (2011) 51 Cal.4th 510 (*Ary II*), our Supreme Court suggested, but did not decide, that holding a retrospective competency hearing is *not* a constitutionally permissible remedy for the failure to hold a competency hearing. (See *id.* at pp. 514, fn.1, 516–517 [noting "correct procedure . . . would [be] to reverse the judgment of conviction," and citing *People v. Young* (2005) 34 Cal.4th 1149, 1217, but reserving issue as "[n]ot before us"]; see also *Ary II*, at pp. 521–522 [Werdegar, J., concurring] ["[r]eason exists to believe the United States Supreme Court would not approve the [retrospective competency] procedure," citing *Drope*, *supra*, 420 U.S. 162, 183 and *Dusky*, *supra*, 362 U.S. at p. 403].)

A year later, in *Lightsey*, our Supreme Court held a deprivation of the defendant's statutory right to have counsel to represent him in the competency proceeding *could* be cured, in the circumstances before it, by "ordering a limited reversal and remand for the trial court to determine whether a retrospective competency hearing is feasible and, if so, to conduct such a hearing." (*Lightsey*, *supra*, 54 Cal.4th at p. 706.) *Lightsey* distinguished the flawed competency proceeding in that case from a situation in which a trial court fails to conduct the competency hearing at all. (See *id.* at pp. 703, 707–708). *Ary II* and *Lightsey* thus left unresolved the conflict among the Courts of Appeal.

Fortunately we need not swing our bat on this sticky wicket because even if a retrospective competency determination could in some circumstances be a constitutional remedy for failure to hold a competency hearing, it is not an appropriate remedy here. Courts have indicated that a retrospective remedy is disfavored because of the "difficulty of retrospectively determining an accused's competence to stand trial." (*Pate*, *supra*, 383 U.S. at p. 387.)[20] In determining whether a meaningful retrospective hearing is possible, courts consider the availability of evidence relating to the defendant's mental faculties at

---

**[20]** See *Drope*, *supra*, 420 U.S. at p. 183 ("Given the inherent difficulties of such a *nunc pro tunc* determination under the most favorable circumstances [citations], we cannot conclude that such a procedure would be adequate here"); *McMurtreys v. Ryan* (9th Cir. 2008) 539 F.3d 1112, 1131–1132 (passage of time, lack of medical records and absence of doctor who assessed petitioner at time of trial prevented meaningful post hoc assessment of competency).

the relevant time.  (See, e.g., *Ary I*, *supra*, 118 Cal.App.4th at pp. 1021–1023, 1029; see also *Lightsey*, *supra*, 54 Cal.4th at pp. 682–690, 707.)  Among the most important factors courts consider in assessing whether a defendant is competent are the opinion and observations of defense counsel.  (See *Medina v. California* (1992) 505 U.S. 437, 450 [112 S.Ct. 2572] ["defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"]; *Drope*, *supra*, 420 U.S. at p. 177, fn.13 ["expressed doubt" about defendant's competence by defense attorney, who has " 'the closest contact with the defendant,' [citation] is unquestionably a factor which should be considered"]; see also ABA Criminal Justice Mental Health Standards (1989) Std. 7-4.8, Commentary, p. 211 ["[D]efense counsel may well be the single most important witness on that dimension of incompetency"].)

In this case, Hayes was not evaluated by psychiatric or psychological professionals at any time after he was returned from Napa State Hospital through the time the jury rendered its verdict.  While he was evaluated shortly before sentencing, the sole professional who actually interviewed him at that time (Kessler) had previously found him competent to stand trial on grounds that other professionals and the trial court had previously rejected.  Further, Kessler did not address whether Hayes was competent at the time of trial or competent to assist counsel (or himself) in defense of his case.  Rather, Kessler stated he was informed by the trial court that he need only consider, and therefore only did consider, whether Hayes was competent to be sentenced.

But there is an even more fundamental problem in this case.  Hayes was not represented at either the preliminary hearing or at the trial, or at any time in between, because the trial court granted his *Faretta* motion shortly after he was returned from Napa State Hospital.  His initial counsel (Martin) declared a conflict and was allowed to withdraw, his appointed conflict counsel declined to serve as advisory counsel, and the court did not appoint other advisory counsel until near the end of the trial.  And that belatedly appointed advisory counsel was not present during the remainder of the trial.  As a result, there was *no defense counsel present* through the relevant proceedings who

54

could potentially testify about Hayes's competence to assist in or represent himself at trial.

Thus, here there is lacking both contemporaneous medical evidence of Hayes's mental condition at the time of trial and testimony of defense counsel who would be most knowledgeable about his ability to assist in his own defense before and during the trial. Moreover, it has now been three and one half years since Hayes's trial. In analogous circumstances, the United States Supreme Court declined to remand for a retrospective competency determination (see *Drope*, *supra*, 420 U.S. at pp. 182–183; *Pate*, *supra*, 383 U.S. at p. 387). We also decline to do so here.

For these reasons, we reverse the conviction and remand the case for a new trial, if and when the court determines Hayes has the ability to assist counsel in a rational defense and is otherwise competent to stand trial.

## IV.

### *The Sentence*

The sentence imposed on Hayes is highly unusual and exceptionally harsh and was more than double the 12 years and eight months requested by the People, who earlier in the case were prepared to accept probation. The trial judge's annoyance with Hayes, who repeatedly disregarded her admonitions about the irrelevance of his arguments and the evidence he sought to present, failed to immediately accept her evidentiary rulings and frequently interrupted her and the witnesses, is evident from the transcript, and the judge apparently imposed the sentence over Hayes's yelling and screaming in the courtroom during the sentencing proceedings. In any evesnt, we need not decide whether the sentence imposed was an abuse of the court's discretion because we reverse for the reasons set forth above.

## DISPOSITION

The judgment against Hayes is reversed. We remand this matter to the trial court for further proceedings consistent with this opinion.

_____
STEWART, J.

We concur.


_____
RICHMAN, Acting P.J.


_____
MILLER, J.

56

*People v. Hayes* (A136366)